STATE of Minnesota, Respondent,

v.

Kenneth Maurice JOHNSON, Appellant.

No. A11–6.

Court of Appeals of Minnesota.

Jan. 30, 2012.

Review Denied March 28, 2012.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Jodie L. Carlson, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by BJORKMAN, Presiding Judge; SCHELLHAS, Judge; and COLLINS, Judge.*

## OPINION

SCHELLHAS, Judge.

Appellant challenges his conviction of aiding and abetting first-degree aggravated robbery, arguing that (1) the district court erred by joining his and his codefendant's cases; (2) the state violated his right to a speedy trial; (3) the district court erred by allowing the state to present evidence of appellant's post-arrest, pre-*Miranda* silence; (4) the district court erred by admitting into evidence photographs of appellant and other arrestees in handcuffs; and (5) the state failed to prove beyond a reasonable doubt that appellant directly participated in or aided and abetted first-degree aggravated robbery. We affirm.

## FACTS

Four men robbed B.A. in downtown Minneapolis on February 8, 2010, near bar-closing time. B.A. testified that after leaving a bar, he walked down Second Avenue and turned on Fourth Street, towards First Avenue. As he walked past Pizza Luce, seven men approached him. Johnson and three others surrounded B.A.; punched him twice in the face; and stole his cell phone, wallet, and money. The robbery took less than one minute and left B.A. with cuts above his eye and inside his mouth.

After the robbery, B.A. walked in the opposite direction of his assailants and found an off-duty police officer, Officer Daniel Lysholm, inside a restaurant. B.A.

banged on the window of the restaurant and said, "I got jumped by those guys." Lysholm exited the restaurant, and B.A. pointed toward the men who robbed him. Less than 20 seconds elapsed between the robbery and the time that B.A. pointed out the men to Lysholm. The men were not near any other persons when Lysholm saw them. Lysholm radioed for assistance and provided a description of the men's jackets. Two police officers in a nearby squad car heard the radio dispatch, saw the men, immediately approached them, and arrested them. B.A. and Lysholm never lost sight of the men from the time B.A. approached Lysholm until the time of the men's arrest.

Officers identified the men as appellant Kenneth Johnson, codefendant Corey Maull, Giorgio Tyler, and Darail Murphy. During the arrest, an officer noticed a pile of identification cards and credit cards lying on the ground between Johnson and Murphy. B.A. approached and identified the cards as his. Then without prompting by the officers, B.A. said to Johnson and Murphy, who were standing near the rear of a squad car, "Why did you beat me? Why did you take my things?" Neither Johnson nor Murphy responded.

In an amended complaint, the state charged Johnson with aiding and abetting first-degree aggravated robbery in violation of Minn.Stat. § 609.245, subd. 1 (2008), and Minn.Stat. § 609.05 (2008), and later moved the district court to join the cases against Johnson and Maull.

On April 8, Johnson demanded a speedy trial, and the district court set a trial date for June 1 or 2 but later continued the trial to June 3 because the court was presiding over another trial.[1] Johnson's counsel had

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. The record is unclear whether the trial was

a scheduling conflict on June 3, so the court continued the trial to August 16 and informed the parties and counsel that it was joining Johnson's case with Maull's. Johnson re-asserted his demand for a speedy trial on June 3.

A jury found Johnson and Maull guilty. This appeal follows.

### ISSUES

I. Did the district court err by joining Johnson's and codefendant Maull's cases?

II. Did the state violate Johnson's right to a speedy trial?

III. Did the district court abuse its discretion by allowing the state to present evidence of Johnson's post-arrest, pre-*Miranda* silence?

IV. Did the district court abuse its discretion by admitting into evidence photographs of Johnson and other arrestees in handcuffs?

V. Did the state prove beyond a reasonable doubt that Johnson participated in or aided or abetted first-degree aggravated robbery?

### ANALYSIS

### I. Joinder

Johnson challenges the district court's joinder of his case with codefendant Maull's.

■ "When two or more defendants are charged with the same offense, they may be tried separately or jointly at the court's discretion." Minn. R.Crim. P. 17.03, subd. 2. The joinder rule "neither favors nor disfavors joinder." *State v. Jackson*, 773 N.W.2d 111, 118 (Minn.2009). In determining whether joinder is appropriate, the district court must balance four factors: "(1) the nature of the offense

scheduled to start on June 1 or June 2, 2010.

charged; (2) the impact on the victim; (3) the potential prejudice to the defendant; and (4) the interests of justice." Minn. R.Crim. P. 17.03, subd. 2; *Jackson*, 773 N.W.2d at 118. In reviewing a joinder issue, this court conducts "an independent inquiry into any substantial prejudice to defendants that may have resulted from their being joined for trial." *State v. Blanche*, 696 N.W.2d 351, 370 (Minn.2005) (quotation omitted).

### A. Nature of the Offense Charged

■ The nature of the offense charged favors joinder when "the overwhelming majority of the evidence presented [is] admissible against both [defendants], and substantial evidence [is] presented that [codefendants] worked in close concert with one another." *State v. Martin*, 773 N.W.2d 89, 99–100 (Minn.2009) (quotations and citation omitted).

Johnson argues that this factor does not favor joinder because cases in which defendants have been joined were more serious and more complex than his and included evidence that the codefendants each played an important role before and after the crime. But the state charged Johnson and Maull with the same crime—aiding and abetting first-degree aggravated robbery—stemming from the same incident against the same victim. The complaints against the codefendants were identical, and the state alleged that the codefendants worked in concert to commit the crime. The overwhelming majority of evidence was admissible against both codefendants.

The district court reasoned that this factor weighed in favor of joinder because the codefendants acted "in close concert" with each other. We agree. *See Jackson*, 773 N.W.2d at 118–19 (reasoning that nature of offense favored joinder when codefen-

dants were charged with same crimes, majority of evidence was admissible against both codefendants, and substantial evidence showed that codefendants worked in close concert with each other).

## B. Impact on Victim

When analyzing the impact on the victim, the supreme court has considered "the impact on both the victim of the crime as well as the trauma to the eyewitnesses who would be compelled to testify at multiple trials." *Blanche*, 696 N.W.2d at 371. The district court noted that there were "no indications that [B.A.] is a particularly vulnerable victim.... I'm sure [the robbery] was upsetting, but I don't know that it was particularly. And it was traumatic for the victim, but I don't know that he'd appreciate reliving it at least two times, two separate trials."

Johnson argues that "there is no evidence that separate trials would have any impact whatsoever on the complainant." We do not embrace Johnson's sweeping and cavalier statement about the lack of any impact on an aggravated-robbery victim of being required to testify in separate trials. We conclude that this factor neither favored nor disfavored joinder.

## C. Potential Prejudice to Defendant

"Joinder is not appropriate when there would be substantial prejudice to the defendant, which can be shown by demonstrating that codefendants presented 'antagonistic defenses.'" *Martin*, 773 N.W.2d at 100. "Antagonistic defenses occur when the defenses are inconsistent, and the jury is forced to choose between the defense theories advocated by the defendants." *Id.* (quotations omitted).

Johnson argues that he was prejudiced by joinder because the joint trial "adversely influenced [Johnson]'s ability to reasonably persuade the jurors that he was the wrong person where [Johnson and Maull] were both trying to present the same theory," and joinder delayed his trial. The district court noted that when the state moved for joinder, Johnson and Maull did not present antagonistic defenses. And, as in *Martin* and *Jackson*, Johnson and Maull regularly adopted the motions and objections of the other. *Martin*, 773 N.W.2d at 100; *Jackson*, 773 N.W.2d at 119. The jury was not forced to choose between Johnson's and Maull's defenses; "rather, the jury had to choose between the state's theory of the case and each defendant's theory of the case." *Martin*, 773 N.W.2d at 100 (quotation omitted); *Jackson*, 773 N.W.2d at 119 (quotation omitted). Johnson's complaint that joinder delayed his trial is unpersuasive. Before the district court joined Johnson's and Maull's cases, Johnson's counsel requested a trial continuance due to his scheduling conflict. We conclude that this factor weighed in favor of joinder.

## D. Interests of Justice

"[T]he length of separate trials is a legitimate factor in deciding to join cases." *Jackson*, 773 N.W.2d at 119. The district court noted that joining the trials would save time. Johnson argues that the interests of justice favored separate trials because of the defendants' antagonistic defenses. We have already rejected that argument, and Johnson makes no other argument about why the interests of justice did not favor joinder in this case. This factor favored joinder.

Three of the four factors favored joinder; the remaining factor was neutral. We therefore conclude that the district court did not err by joining Johnson's and codefendant Maull's cases.

## II. Speedy–Trial Right

Johnson alleges that the state violated his constitutional right to a speedy

trial. The United States and Minnesota Constitutions guarantee the right to a speedy trial. U.S. Const. amend. VI; Minn. Const. art I, § 6; *State v. DeRosier*, 695 N.W.2d 97, 108 (Minn.2005). "By rule in Minnesota, trial is to commence within 60 days from the date of the demand unless good cause is shown ... why the defendant should not be brought to trial within that period." *State v. Hahn*, 799 N.W.2d 25, 29–30 (Minn.App.2011) (quoting *DeRosier*, 695 N.W.2d at 108–09), *review denied* (Minn. Aug. 24, 2011); *see* Minn. R.Crim. P. 11.09(b) ("On demand of any party the trial must start within 60 days of the demand unless the court finds good cause for a later trial date."). "The Supreme Court assigned the burden of protecting speedy trial rights to the court system and prosecutors." *State v. Windish*, 590 N.W.2d 311, 317 (Minn.1999) (citing *Barker v. Wingo*, 407 U.S. 514, 529, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972)); *see also Hahn*, 799 N.W.2d at 30 ("The responsibility for promptly bringing a case to trial rests with the state.").

 "A speedy-trial challenge presents a constitutional question subject to de novo review." *Hahn*, 799 N.W.2d at 29. For determining whether an accused has been deprived of the right to a speedy trial, Minnesota courts have adopted the four-factor balancing test announced in *Barker*. *DeRosier*, 695 N.W.2d at 109. "The four factors are: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the delay prejudiced the defendant." *Hahn*, 799 N.W.2d at 30. "None of the factors is either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be

relevant." *Windish*, 590 N.W.2d at 315 (quotation omitted).

## A. Length of Delay

 Under Minnesota law, a delay of more than 60 days from the date of the speedy-trial demand is presumptively prejudicial, triggering review of the remaining three factors. *Id.* at 315–16. Johnson was arrested on February 8, 2010, and demanded a speedy trial on April 8, 2010, but the trial did not commence until August 16. Johnson's formal demand on April 8 triggered the time periods under Minn. R.Crim. P. 11.09(b), but a formal demand is not necessary to put the constitutional right at issue. *Id.* at 318. "Any material delay is a 'triggering mechanism' that requires further review of whether the speedy-trial claim was violated." *State v. Rhoads*, 802 N.W.2d 794, 806 (Minn.App. 2011), *review granted on other grounds* (Minn. Oct. 18, 2011). The delay has been measured from the date of arrest. *Id.* A delay of six months is sufficient to trigger further inquiry. *Id.*

Here, the delay of more than six months creates the presumption that Johnson's speedy-trial right was violated and triggers further inquiry. But "the length of time does not, as an independent factor, provide strong support for finding a violation." *Id.* at 806–07.

## B. Reason for Delay

 "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily...." *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192. But "[t]he defendant cannot expect this court to allow him to delay his own trial to a point where we find there was a speedy trial violation.... [W]hen the overall delay in bring-

ing a case to trial is the result of the defendant's actions, there is no speedy trial violation." *State v. Johnson*, 498 N.W.2d 10, 16 (Minn.1993).

Johnson argues that his trial delay is attributable to the state for two reasons. First, his counsel's scheduling conflict on June 3 only arose because trial did not commence on June 1 or 2, because the assigned judge was presiding over another trial. Second, the state's motion for joinder, which the district court granted, caused scheduling delays. Johnson's arguments are unpersuasive. The initial trial date of June 1 or 2, was approximately 54 or 55 days after Johnson's speedy-trial demand. When the court continued Johnson's trial to June 3 because of the court's scheduling conflict, the trial was set to commence 56 days after Johnson's speedy-trial demand. Only because Johnson's counsel was unavailable on June 3 was Johnson's trial further continued. Because of counsel's scheduling conflict, the court continued the trial to August 16, the earliest date on which the court, the prosecutor, and defense counsel for both defendants were available. The record contains no evidence that the state acted in bad faith to delay the trial. *See Hahn*, 799 N.W.2d at 32 ("[An] administrative delay, by itself, is generally insufficient to violate a defendant's speedy-trial right in the absence of a deliberate attempt to delay trial.").

On this record, we conclude that Johnson bears responsibility for the overall delay in bringing the case to trial. This factor therefore does not weigh in favor of Johnson's argument that he was denied a speedy trial.

## C. Assertion of Speedy–Trial Right

The state essentially concedes that Johnson adequately asserted his speedy-trial right on April 8, 2010. This factor therefore weighs in favor of Johnson's argument that he was denied a speedy trial.

## D. Prejudice

"The Supreme Court has identified three interests that are protected by the right to a speedy trial: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) preventing the possibility that the defense will be impaired." *Windish*, 590 N.W.2d at 318 (citing *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193). Of the three interests, impairment of a defense is the most important. *Hahn*, 799 N.W.2d at 33. Johnson argues that his "defense may well have been adversely affected by his pretrial incarceration." But Johnson does not support his assertion with facts or even discuss how his defense was impaired. *See State v. Friberg*, 435 N.W.2d 509, 515 (Minn.1989) ("The only prejudice attested to at the hearing was the stress, anxiety and inconvenience experienced by anyone who is involved in a trial. Because the delay in no way affected the strength of defendants' case, the final *Barker* factor does not favor defendants."). "And pretrial incarceration alone, while unfortunate, is ... not enough to demonstrate prejudice." *Rhoads*, 802 N.W.2d at 807–08. Therefore, the fourth factor does not weigh in Johnson's favor.

In weighing the *Barker* factors, two factors—the length of delay and the demand for speedy trial—weigh in Johnson's favor, and two factors—the reason for the delay and prejudice—do not weigh in Johnson's favor. Because Johnson bears responsibility for the overall delay in the commencement of his trial and because he cannot show prejudice, we conclude that Johnson's right to a speedy trial was not violated.

### III. Post–Arrest, Pre-*Miranda* Silence

#### A. Fifth Amendment Right Against Self–Incrimination[2]

 The core protections of the Fifth Amendment provide that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

> The protection against compelled self-incrimination guarantees the right of a defendant to remain silent during his criminal trial by prohibiting the State from forcing a defendant to testify against himself. The Fifth Amendment also prohibits the State from commenting on the silence of a defendant who asserts his right not to testify at his trial.... [A]llowing the State to comment on a defendant's decision not to testify unfairly penalizes the defendant for exercising a constitutional privilege. Once a defendant elects to testify in his defense, however, he casts aside his cloak of silence and may be impeached by evidence that he remained silent before arrest without the impeachment running afoul of the Fifth Amendment.

*State v. Borg,* 806 N.W.2d 535, 541–42 (Minn.2011) (citations and quotations omitted).

 The Supreme Court has addressed the use of a criminal defendant's silence in a myriad of circumstances. Pre-arrest silence can be used for impeachment purposes. *Jenkins v. Anderson,* 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980). Post-arrest, pre-*Miranda* silence can be used for impeachment purposes. *Fletcher v. Weir,* 455 U.S. 603, 605–07, 102 S.Ct. 1309, 1311–12, 71 L.Ed.2d 490 (1982). Post-arrest, post-*Mi-*

*randa* silence cannot be used for impeachment purposes, *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), and cannot be used during the state's case-in-chief. *Wainwright v. Greenfield,* 474 U.S. 284, 295, 106 S.Ct. 634, 640–41, 88 L.Ed.2d 623 (1986).

 In *Borg,* a case of first impression in Minnesota, a police officer testified during the state's case-in-chief that "[the officer] made an attempt by mail to interview Borg and received 'no response.'" *Borg,* 806 N.W.2d at 543. The Minnesota Supreme Court stated that "[w]hen the government does nothing to compel a person who is not in custody to speak or to remain silent, however, then the voluntary decision to do one or the other raises no Fifth Amendment issue." *Id.* In regard to Borg's pre-arrest, pre-*Miranda* silence, the supreme court held that "if a defendant's silence is not in response to a choice compelled by the government to speak or remain silent, then testimony about the defendant's silence presents 'a routine evidentiary question that turns on the probative significance of that evidence.'" *Id.* (quoting *Jenkins v. Anderson,* 447 U.S. 231, 244, 100 S.Ct. 2124, 2132, 65 L.Ed.2d 86 (1980) (Stevens, J., concurring)).

 In this case, the district court allowed the state, during its case-in-chief, to present evidence of Johnson's *post*-arrest, pre-*Miranda* silence in response to B.A.'s accusatory questions, which police did not prompt. Neither the Supreme Court nor the Minnesota Supreme Court has addressed whether a defendant's post-arrest, pre-*Miranda* silence can be used in the state's case-in-chief. Johnson argues that the state presented this evidence "for the

---

**2.** Although Johnson mentions in his brief that article I, section 7, of the Minnesota Constitution protects him from self-incrimination, he bases his arguments on the Fifth Amendment.

We therefore only address whether the Fifth Amendment protects post-arrest, pre-*Miranda* silence.

inference that an innocent person wrongly arrested would have responded to [B.A.'s] query." He argues that "[b]ecause [he] was under arrest and surrounded by police officers at the time [B.A.] asked his accusatory questions, [Johnson] may very well have felt that he was under government compulsion," but he stops short of arguing that B.A.'s questions should be treated as government compulsion. Instead, Johnson argues that this court need not "resolve the question of whether [his] pre-*Miranda* silence was constitutionally admissible because his silence was not admissible under the rules of evidence." We disagree. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos,* 658 N.W.2d 201, 203 (Minn.2003) (citation omitted).

We conclude that *Borg,* filed after Johnson submitted his brief, strongly suggests that the rules of evidence cannot serve as our sole source of guidance in deciding whether the district court erred by allowing the state, during its case-in-chief, to present evidence of Johnson's *post*-arrest, pre-*Miranda* silence.

The use of post-arrest, pre-*Miranda* silence during the state's case-in-chief is unsettled in the federal courts. Three circuits, including the Eighth Circuit, have held that, in some circumstances, the use of post-arrest, pre-*Miranda* silence does not violate a defendant's Fifth Amendment right. *See United States v. Frazier,* 408 F.3d 1102, 1111 (8th Cir.2005); *United States v. Rivera,* 944 F.2d 1563, 1568 (11th Cir.1991); *United States v. Love,* 767 F.2d 1052, 1063 (4th Cir.1985). Three other circuits have held that the use of a defendant's post-arrest, pre-*Miranda* silence

during the state's case-in-chief violates the Fifth Amendment. *See United States v. Velarde–Gomez,* 269 F.3d 1023, 1033 (9th Cir.2001) (en banc); *United States v. Moore,* 104 F.3d 377, 385, 389 (D.C.Cir. 1997); *United States v. Hernandez,* 948 F.2d 316, 323 (7th Cir.1991).

 Although we are not bound by the Eighth Circuit's decision in *Frazier,* we find it persuasive. *See State v. McClenton,* 781 N.W.2d 181, 191 (Minn.App.2010) ("We recognize that although we are not bound to follow precedent from other states or federal courts, these authorities can be persuasive."), *review denied* (Minn. June 29, 2010).

In *Frazier,* the district court allowed the state, during its case-in-chief, to present evidence that when officers told Frazier why he was being arrested, he did not say anything. 408 F.3d at 1107. On appeal, Frazier argued that "because the introduction of his silence was not for impeachment purposes, it was improper" and violated his Fifth Amendment right against self-incrimination. *Id.* at 1109–10. *Frazier* presented the Eighth Circuit with an issue of first impression: "whether the use of Frazier's postarrest, pre-*Miranda* silence during the government's case-in-chief was constitutional." *Id.* The Eighth Circuit held that the testimony did not violate Frazier's right against self-incrimination, reasoning that:

Although we have previously held that the receipt of *Miranda* warnings is determinative of the constitutional issue, the more precise issue is whether [the defendant] was under any compulsion to speak at the time of his silence. He was not. Although [the defendant] was under arrest, there was no governmental action at that point inducing his silence. Thus he was under no government-imposed compulsion to speak. It is not as if [the defendant] refused to answer

questions in the face of interrogation. We are speaking in this case only of the defendant's silence during and just after his arrest. As noted earlier, an arrest by itself is not governmental action that implicitly induces a defendant to remain silent. Therefore, on these facts, the use of [the defendant's] silence in the government's case-in-chief as evidence of guilt did not violate his Fifth Amendment rights. We do not decide today whether compulsion may exist under any other postarrest, pre-*Miranda* circumstances.

*Id.* at 1111 (citations and quotation omitted).

In this case, as in *Frazier*, the state did not compel Johnson "to speak at the time of his silence." *Id.* Johnson remained silent in response to B.A.'s questions, questions not posed by the government. Although Johnson had been arrested, he was under no government-imposed compulsion to speak at the time of his silence. We therefore conclude that Johnson's silence did not implicate the Fifth Amendment.

### B. Admissibility Under Rules of Evidence

 Johnson also argues his silence was not admissible under Minn. R. Evid. 402 because it was not relevant and, even if relevant, it should have been excluded under rule 403 because the danger of unfair prejudice substantially outweighed its probative value. We disagree.

 The Minnesota Supreme Court has held that "a defendant's silence in the face of direct accusation was admissible," and that " 'silence under accusation permits an inference that the accused acquiesced in the statement and admitted its truth.' " *State v. Patterson*, 587 N.W.2d 45, 52 (Minn.1998) (quoting *State v. Brown*, 209 Minn. 478, 481, 296 N.W. 582, 585 (1941)). Here, Johnson remained silent in the face of B.A.'s direct accusatory questions, and therefore the rules of evidence permit an inference that Johnson acquiesced in the statements and admitted their truth. Johnson's argument that the district court should have excluded evidence about his silence under the rules of evidence is without merit.

### IV. Admissibility of Photograph Depicting Johnson in Handcuffs

 Johnson challenges the district court's ruling to allow photographs of Johnson and the other arrestees in handcuffs into evidence. He argues that the photographs were more prejudicial than probative under Minn. R. Evid. 403. "We review the admission of photographic evidence for abuse of discretion." *State v. Hurd*, 763 N.W.2d 17, 30 (Minn.2009).

Johnson compares the photographs to the use of restraints on a defendant in the courtroom and to the use of mug shots as evidence and argues that the photographs were unduly prejudicial. We disagree. The district court informed the jury that Johnson was arrested, and the record is clear that the photographs were taken at the time of arrest. The jury could assume that Johnson would be in handcuffs as part of "standard law enforcement practice." *See State v. Hull*, 788 N.W.2d 91, 105 (Minn.2010) (stating that a defendant's appearance in restraints inside a courtroom is distinguishable from an appearance in restraints in transit to or from the courtroom, which a jury would take to be "standard law enforcement practice"). Additionally, the photographs were probative of the identification of Johnson because when B.A. approached Officer Lysholm, he pointed to Johnson and the others, and Lysholm provided descriptions of the men and their jackets in his radio dispatch about the men. We conclude that the probative value of the evidence outweighed

its prejudicial effect and that the district court did not err in admitting the photographs into evidence.

## V. Sufficiency of the Evidence

Johnson claims the evidence was insufficient to support his conviction of aiding and abetting first-degree aggravated robbery because B.A.'s identification of him was neither credible nor supported by corroborating evidence. Johnson also argues that the state failed to prove accomplice liability.

 "When assessing whether the evidence is sufficient to support a conviction, we conduct a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Nissalke,* 801 N.W.2d 82, 108 (Minn.2011) (quotation omitted). "[W]e will not disturb a guilty verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that a defendant was proven guilty of the offense charged." *Id.* (quotation omitted). "We construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses." *Id.* (citation omitted). "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* — U.S. —, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011).

Here, the state charged Johnson with aiding and abetting first-degree aggravated robbery in violation of Minn.Stat. § 609.245, subd. 1, which provides that "[w]hoever, while committing a robbery, is armed with a dangerous weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon, or inflicts bodily harm upon another, is guilty of aggravated robbery in the first degree."

### A. Credible Testimony

Johnson primarily argues that B.A.'s identification of him was not credible because B.A. had a limited amount of time to view his assailants, he was injured above his eye and adversely affected by the stress of his injuries, and he did not describe the robbers—he only pointed to a group of men and the assisting officer aired a description of their clothing. We disagree.

 This court can sustain a conviction based on identification by a single witness. *State v. Miles,* 585 N.W.2d 368, 373 (Minn. 1998). "An identification need not be positive and certain to support a conviction—it is sufficient if a witness testifies that in his belief, opinion, and judgment the defendant is the one he saw commit the crime. Weighing the credibility of witnesses is the province of the jury." *State v. Landa,* 642 N.W.2d 720, 725 (Minn.2002) (citation omitted). In this case, the jury heard testimony that the robbery of B.A. took less than one minute and that approximately 20 seconds passed between the commission of the robbery and when B.A. pointed out Johnson and the others on the street to Lysholm. The jury could have reasonably believed this identification testimony.

### B. Corroborative Evidence

 Johnson also argues that no corroborative evidence linked Johnson to the robbery. He asserts that he did not possess any of B.A.'s belongings when he was arrested and his behavior of "nonchalantly walking" along the street was incon-

sistent with having just committed a robbery.

Although it is commonly stated that uncorroborated eyewitness identification testimony of a single witness is sufficient to support a guilty verdict ... not all single eyewitness cases are the same and ... when the single witness'[s] identification of a defendant is made after only fleeting or limited observation, corroboration is required if the conviction is to be sustained.

*State v. Walker*, 310 N.W.2d 89, 90 (Minn. 1981). Here, B.A.'s observation of the four men was more than "fleeting or limited." *See State v. Thompson*, 414 N.W.2d 580, 583 (Minn.App.1987) (noting 10 to 13 seconds of observation at close range is "more than a fleeting opportunity for identification"), *review denied* (Minn. Jan. 15, 1988). B.A. saw them approach him on the street before they robbed him, he saw them at close range during the robbery, he saw them walk away from him, and he continued to watch them after he approached Lysholm. Corroborative evidence therefore was not required. Even if corroborative evidence were required, the pile of B.A.'s cards that the officers found on the ground between Johnson and Murphy was evidence that corroborated B.A.'s testimony.

### C. Accomplice Liability

Johnson argues that the state failed to introduce evidence that he knew the robbery was going to occur and intended to further the robbery. A person is liable for a crime committed by another if he "intentionally aids, advises, hires, counsels, or conspires with" another person to commit the crime. Minn.Stat. § 609.05, subd. 1. "To impose liability under the aiding and abetting statute, the state must show that the defendant played a knowing role in the commission of the crime." *State v. Crow*, 730 N.W.2d 272, 280 (Minn.

2007). "Mere presence at the crime scene does not alone prove that a person aided or abetted...." *Id.* But "active participation in the overt act that constitutes the substantive offense is not required, and a defendant's presence, companionship, and conduct before and after an offense is committed are relevant circumstances from which the jury may infer criminal intent." *State v. Gates*, 615 N.W.2d 331, 337 (Minn. 2000), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), *as recognized by State v. Pendleton*, 759 N.W.2d 900, 909 (Minn.2009).

Here, the state presented evidence from which Johnson's knowing role in the robbery and criminal intent could be inferred. B.A. testified that a man wearing a black jacket punched him in the eye and took his wallet. A police officer identified Johnson as the man wearing the black jacket. During the arrest, a police officer found B.A.'s cards on the ground between Johnson and another group member. *See State v. Jackson*, 726 N.W.2d 454, 460 (Minn.2007) (stating that "factors such as defendant's presence at the scene of the crime, defendant's close association with the principal before and after the crime, defendant's lack of objection or surprise under the circumstances, and defendant's flight from the scene of the crime" may reasonably support a conviction of the defendant as an accomplice (quotation omitted)).

Based on our careful review of the record, viewed in the light most favorable to the verdict, we conclude that the evidence was sufficient to support Johnson's conviction. The evidence is not purely circumstantial; it is not based on speculation and conjecture; it is sufficient to allow a jury to find that Johnson aided and abetted first-degree aggravated robbery; and we assume that the jury chose to disbelieve any evidence inconsistent with the verdict.

## DECISION

The district court did not err by joining Johnson's and Maull's cases. Johnson's right to a speedy trial was not violated. The district court did not err by admitting evidence about Johnson's post-arrest, pre-*Miranda* silence, and the admission of that evidence did not violate Johnson's Fifth Amendment right against self-incrimination. The district court did not err by admitting photographic evidence of Johnson in handcuffs at the time of his arrest. The jury could reasonably conclude that Johnson aided or abetted first-degree aggravated robbery.

**Affirmed.**