*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0209**

State of Minnesota,
Respondent,

vs.

George Howland Jackson,
Appellant.

**Filed December 22, 2014
Affirmed
Larkin, Judge**

Ramsey County District Court
File No. 62-CR-13-1425

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Renee Bergeron, Assistant State Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hudson, Presiding Judge; Peterson, Judge; and Larkin, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges his conviction of violation of an order for protection, arguing that he was denied his right to a speedy trial and that the evidence is insufficient to sustain his conviction. We affirm.

**FACTS**

On February 26, 2013, St. Paul police officers arrested appellant George Howland Jackson after discovering him in a vehicle with a passenger who identified herself as D.G., a woman who had an active order for protection (OFP) against Jackson. The state charged Jackson with violation of an OFP, and the district court conditionally released him after his first appearance on February 28.

On March 14, Jackson appeared before the district court for an omnibus hearing. Jackson's public defender requested a two-week continuance because Jackson had provided "a considerable amount of documents," which Jackson believed to be relevant to his case. The prosecution did not object, and the district court rescheduled the hearing for March 28. At the March 28 omnibus hearing, Jackson pleaded not guilty and orally demanded a speedy trial. The district court scheduled the case for a pretrial conference on April 19 and a trial on May 20.

On April 19, Jackson's attorney informed the district court that Jackson claimed that the passenger in the vehicle was D.G.'s sister and not D.G. The prosecutor stated that she would "need [the sister's] name, date of birth, address, [and] current phone numbers in order to do additional investigation." Jackson's attorney explained that he

2

had told the prosecutor the sister's last name and that she was in Milwaukee. Jackson's attorney added that he "did talk with the person named in the order for protection, and she did tell us she was not in the motor vehicle, rather, it was her sister." The district court asked Jackson's attorney if he planned to provide additional discovery regarding the passenger's identity, and the attorney stated, "If I can find it. . . . [M]y priority right now is to find this individual's date of birth."

Prior to the May 20 trial date, Jackson requested a continuance to accommodate a scheduled surgery and his anticipated recovery time.[1] The district court granted Jackson's request.

On the next scheduled trial date, July 22, the district court inquired regarding the state's effort to identify the passenger. Jackson's attorney stated that he had given the state "some additional evidence" about D.G.'s sister, whose name is P.G. and whose last known address was in Milwaukee. He also disclosed a transcript of a squad video that the defense intended to play at trial. The prosecutor stated that she had "been unable to locate anyone by the name of [P.G.]" Jackson's attorney told the district court that he had found several Milwaukee addresses for P.G. but that he had not spoken to her. The district court rescheduled the trial for August 2. Jackson did not object.

On the third trial date, August 2, the state requested a continuance. The prosecutor stated, "We received evidence yesterday from Wisconsin in which we now need to obtain certified documents. We also would need to add . . . [P.G.] to our witness list, go through

---

[1] The parties stipulate that Jackson "sought and received a one-to-two-week continuance of his trial from the scheduled trial date of May 20, 201[3], in order to have and to recover from a necessary surgical procedure."

interstate compact in order to subpoena her for the trial also." The district court told Jackson that if he did not stipulate to the admissibility of the documents the state was seeking, it was "probably going to grant that continuance because [the state] has a right to get certified documents." Jackson indicated that he would not agree to a stipulation. The district court asked Jackson's attorney for his position on a continuance, and the attorney stated:

> Well, my client has interposed a speedy trial demand . . . even though he's not in custody. However, he's kind of in a bad position in the sense that he either agrees to the continuance or the judge orders the continuance over our objection. Or he stipulates to the evidence, which he's apparently not agreeing to do. So we are asserting his speedy trial rights today and would like to proceed.

The district court granted the continuance and rescheduled the trial for September 23. The court stated that it granted the continuance in part because "the last continuance of trial was actually requested by [the] defense. This is the first continuance requested by the state."

Jackson's trial began on September 23. The state called several witnesses, including St. Paul police officers Brian Doblar and Matthew Sweeney. Officer Doblar testified that after stopping a car that Jackson was driving, he ran the license plate and learned that the car was registered to D.G., who had an OFP against Jackson. There was a female passenger in the car. Officer Doblar stated that although he did not formally identify the passenger, the passenger told him that she owned the car.

The state also introduced copies of squad videos showing Jackson's arrest. The district court allowed the jury to read transcripts of the audio portion of the videos while

4

the videos were played during trial. The transcripts indicate that Officer Doblar asked the passenger if the car was hers, and she responded affirmatively. The passenger later stated, without being asked, that the car was hers. After the officers arrested Jackson, the passenger once again told Officer Doblar that the car was hers. But when Officer Sweeney mentioned the OFP, the passenger stated, "I'm not her," "I'm [P.G.]," and "That's my sister [who has the restraining order]." Officer Sweeney told the passenger that she could go to jail for providing false information to a police officer. The passenger responded, "I don't want to go to jail," and she pleaded that Officer Sweeney not take Jackson to jail.

The following exchange occurred next:

> SWEENEY: Yeah, it's your car right?
> FEMALE: Yeah.
> SWEENEY: Huh?
> FEMALE: I don't know what to say ya'll just got me.
> . . . .
> DOBLAR: You're [D.G.] correct? Is that correct?
> FEMALE: If I'm not her, are you taking me to jail?
> . . . .
> DOBLAR: . . . You say it's your car. First thing, you told me it was your car. Right. I go back there. I have already run the license plate. You look like the registered owner. [D.G.] Correct? You come back with a permanent protection order against [Jackson]. You see what I am saying? So are you [D.G.]? I will give you one chance. Otherwise I am going to pull you out and put you in handcuffs too.
> FEMALE: Don't do that. Don't be mean to me.
> DOBLAR: Ma'am I'm . . . not being mean to you.
> FEMALE: Okay. I'ma go home. I'm her.

Later, Officer Doblar asked the passenger why she obtained the OFP against Jackson. She responded that she and Jackson were married, had been together for 11

5

years, and have a 12-year-old son together.  She stated that Jackson had filed for divorce and "was doing all these mean things to [her]" and that she got the OFP to avoid losing her Section 8 housing.  She also told Officer Doblar her phone number and confirmed her address.

The state also called Sergeant Sean Lohse-Johnson of the St. Paul Police Department, who testified regarding his investigation of P.G.  He stated that he found a person with P.G.'s name and date of birth through the Wisconsin Department of Vehicle Services.  The state introduced a certified copy of P.G.'s driving record, which included her driver's license photo from 2008.  The state also introduced a driver's license photo of D.G.  Officer Doblar testified that the photo of D.G. was consistent with the woman he saw in the car with Jackson and that he had never seen the woman in the photo of P.G.  Officer Sweeney also testified that the woman in the photo of P.G. did not look like the woman he saw with Jackson on the night of his arrest.

Jackson testified on his own behalf.  He stated that he is married to D.G. and that D.G. is not the mother of any of his children.  He also stated that P.G., who is D.G.'s sister and looks like D.G., was in the car with him when he was pulled over.  He claimed that P.G. told the officers that she owned the car because she was intoxicated.  On cross-examination, Jackson admitted that he had parented D.G.'s 12-year-old son.  He also acknowledged that the two driver's license photos that the state introduced depicted D.G. and P.G.

D.G. did not testify at trial.

6

The jury found Jackson guilty, and the district court placed him on supervised probation. Jackson appeals, arguing that his right to a speedy trial was violated and that the state's evidence is insufficient to sustain his conviction.

**D E C I S I O N**

**I.**

The United States and Minnesota constitutions provide criminal defendants "the right to a speedy and public trial." U.S. Const. amend. VI; Minn. Const. art. I, § 6. Minnesota Rule of Criminal Procedure 11.09(b) provides that a "defendant must be tried as soon as possible after entry of a plea other than guilty." Minnesota courts apply the four-part balancing test from *Barker v. Wingo*, 407 U.S. 514, 530-33, 92 S. Ct. 2182, 2192-93 (1972), to determine whether a defendant has been denied his right to a speedy trial. *State v. Windish*, 590 N.W.2d 311, 315 (Minn. 1999).

The *Barker* factors are (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether the delay prejudiced the defendant. *Id*. at 315. The factors must be considered together in light of the relevant circumstances, and none is dispositive or necessary to a finding that a defendant has been deprived of the right to a speedy trial. *Id.* We review de novo whether a defendant's speedy-trial right was violated. *State v. Cham*, 680 N.W.2d 121, 124 (Minn. App. 2004), *review denied* (Minn. July 20, 2004).

*Length of the Delay*

We calculate a speedy-trial delay "from the point at which the sixth amendment right attaches: when a formal indictment or information is issued against a person or

when a person is arrested and held to answer a criminal charge." *State v. Jones*, 392 N.W.2d 224, 235 (Minn. 1986). Jackson was arrested, charged, and had his first appearance in February 2013. He demanded a speedy trial in March, and his trial began in September. "Under Minnesota law, a delay of more than 60 days from the date of the speedy-trial demand is presumptively prejudicial, triggering review of the remaining three factors." *State v. Johnson*, 811 N.W.2d 136, 144 (Minn. App. 2012), *review denied* (Minn. Mar. 28, 2012); *see* Minn. R. Crim. P. 11.09(b) ("On demand of any party the trial must start within 60 days of the demand unless the court finds good cause for a later trial date."). Because Jackson's trial started more than 60 days after his speedy-trial demand, we review the remaining *Barker* factors.

*Reason for the Delay*

When assessing the reason for the delay, "different weights should be assigned to different reasons." *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192. Although deliberate attempts to delay the trial are weighted "heavily" against the state, more "neutral" reasons for delay, such as negligence or overcrowded courts, are accorded less weight. *Id.* And "when the overall delay in bringing a case to trial is the result of the defendant's actions, there is no speedy trial violation." *State v. Johnson*, 498 N.W.2d 10, 16 (Minn. 1993).

The district court granted several continuances between Jackson's first appearance in February and his trial in September. Jackson's attorney requested a two-week continuance at the first omnibus hearing in March to review documents that Jackson had provided. The district court granted Jackson's request to continue the trial date of May 20, so Jackson could recover from surgery. On the second trial date of July 22, the

8

district court rescheduled the trial because the state had not located P.G. On the third trial date of August 2, the district court granted the state's request for a continuance, over Jackson's objection, so the state could obtain certified documents from Wisconsin, which would prove that P.G. was not the passenger with Jackson.

In sum, Jackson requested two of the continuances, including the continuance that prevented the trial from occurring on May 20, which would have been within 60 days of his March 28 speedy-trial demand. *See Windish*, 590 N.W.2d at 318 ("That a defendant sought a continuance can be weighed under the second prong of the test . . . ."). The July 22 continuance stemmed from the state's attempt to investigate Jackson's defense theory. Because Jackson prompted and supported that investigation, we hold him jointly responsible for the attendant delay. Thus, only the final continuance on August 2 is attributable to the state. But that continuance was prompted, in part, by Jackson's continued assertion that P.G. was the woman in the car. Because Jackson either requested or prompted the continuances, the reason for the delay weighs against Jackson. *See State v. Corarito*, 268 N.W.2d 79, 80 (Minn. 1978) (holding that no speedy-trial violation occurred where "there was a valid reason for the delay and . . . the prosecutor was not trying to delay the trial to hamper the defense").

*Whether the Defendant Asserted His Right to a Speedy Trial*

The "defendant's assertion of the right, is entitled to strong evidentiary weight in determining whether" a violation occurred. *State v. Friberg*, 435 N.W.2d 509, 515 (Minn. 1989) (quotation omitted). "[D]efendants are not required to continuously reassert their demand. Nonetheless, the frequency and force of a demand must be

9

considered when weighing this factor and the strength of the demand is likely to reflect the seriousness and extent of the prejudice which has resulted." *Id.*

Jackson demanded a speedy trial at his second omnibus hearing, but his subsequent actions undermine the weight of the demand. Jackson requested a continuance of the initial trial date. "[T]he import of defense decisions to seek delays . . . can be weighed in the third prong of the *Barker* test." *Windish*, 590 N.W.2d at 318. Moreover, Jackson did not object when the district court continued the second trial date so the state could continue to investigate Jackson's claim that the passenger was P.G. and not D.G. The Minnesota Supreme Court has stated that "defense attorneys should [not] be allowed to sit on their hands and acquiesce in the scheduling of trial dates they know are past the [time limits prescribed by the criminal procedural rules]" and that such practice weighs against the defendant's assertion of the right to a speedy trial. *Friberg*, 435 N.W.2d at 515.

Jackson did not renew his speedy-trial demand until his third trial date, when the state requested a continuance to arrange for the presentation of evidence showing the results of its investigation (i.e., that P.G. was not the woman in the car). At that point, five months had passed since Jackson was charged. *See State v. Sap*, 408 N.W.2d 638, 640 (Minn. App. 1987) (concluding that the third *Barker* factor did not favor a defendant who asserted his speedy-trial rights seven months after he was charged). In sum, Jackson's assertion of the right to speedy trial was minimal, and this factor weighs against him.

10

*Whether the Delay Prejudiced the Defendant*

Prejudice is measured in light of the interests that the speedy-trial right was designed to protect. *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193. Three interests must be assessed: (1) preventing oppressive pretrial incarceration, (2) minimizing the accused's anxiety and concern, and (3) limiting the possibility that the defense will be impaired. *Id.* The third interest is the most important. *Id.*

Jackson was on conditional release between his first appearance in February and his trial in September. He asserts that "his liberty was undeniably restricted" during that period. He notes that the conditions of his release required him to reside at a men's shelter, maintain weekly contact with Project Remand, notify Project Remand within 24 hours of any address or employment changes, and acquire permission before leaving the metro area. He does not assert that he ever considered changing jobs, moving, or leaving the Twin Cities. We do not equate Jackson's conditions of release with "oppressive pretrial incarceration." *Windish*, 590 N.W.2d at 318.

Jackson also states that he "could only guess at his fate" while he awaited trial and "was worried that he would lose his job . . . if he went to jail." These concerns are no different than those faced by any other criminal defendant. *See State v. Williams*, 757 N.W.2d 504, 514 (Minn. App. 2008) ("[T]he record does not reflect any particularized evidence of appellant's anxiety or concern beyond that typically experienced by a defendant in a criminal proceeding . . . ."), *aff'd*, 771 N.W.2d 514 (Minn. 2009).

Moreover, much of the delay resulted from the state's attempts to investigate Jackson's claim that the woman in the car was P.G. and not D.G. The record shows that

11

Jackson did not object to the ongoing investigation of his defense claim, which could have resulted in a favorable outcome for Jackson. Although the investigation ultimately worked against him, the state's willingness to consider and investigate his claim should have minimized any anxiety attendant to the resulting delay.

Lastly, Jackson does not assert that the delay impaired his defense in any way, which is the most important speedy-trial interest. *See Barker*, 407 U.S. at 532, 92 S. Ct. at 2193. Instead, he focuses his argument on the restriction on his liberty and his anxiety. We recognize that Jackson does not have to show actual prejudice. *See Windish*, 590 N.W.2d at 318 ("A defendant does not have to affirmatively prove prejudice; rather, prejudice may be suggested by likely harm to a defendant's case."). And although the delay enabled an investigation that ultimately harmed Jackson's defense, Jackson encouraged that investigation. Under these unique circumstances, the prejudice factor does not favor Jackson.

In conclusion, although the length of delay raises a presumption of prejudice, Jackson was responsible for or acquiesced to the majority of the delay, his assertion of the right to speedy trial was weak, and he was not prejudiced. We are heavily influenced by the fact that most of the delay resulted from Jackson's claim that the passenger was P.G. and not D.G., and his willingness to continue the trial while the state investigated that possibility. Based on our analysis of the *Barker* factors, we hold that Jackson's right to a speedy trial was not violated.

## II.

When considering a claim that the evidence is insufficient to support a conviction, "this court thoroughly examines the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jurors to reach the verdict they did." *State v. Crockson*, 854 N.W.2d 244, 247 (Minn. App. 2014). "We assume that the jury believed all of the state's witnesses and disbelieved any evidence to the contrary." *Id.* (quotation omitted). "We will not alter a verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Id.*

The state was required to prove that Jackson "violate[d] an order for protection issued by a judge." Minn. Stat. § 518B.01, subd. 14(a) (2012). Jackson argues that the state "failed to introduce legally sufficient evidence to prove beyond a reasonable doubt that his passenger was [D.G.], the protected party under the OFP."

On one hand, Jackson correctly notes that the officers did not ask the passenger for "formal identification" or "accurately determine her appearance, height, and weight." Although the passenger told the officers that she was the owner of the car, Jackson argues that she "maintained that she was P.G. until the officers threatened her with arrest" and only said she was D.G. because she was scared and wanted to go home. Jackson testified that the passenger was intoxicated, that P.G. and D.G. look similar and both wear wigs, and that D.G.'s son is not his child. That evidence could have resulted in a not-guilty verdict.

On the other hand, the state presented evidence showing that the passenger was D.G., including the testimony of Officers Doblar and Sweeney and transcripts from the squad-car videos. The passenger told the officers that she owned the car—before they told her that providing false information is a crime—and the car was registered to D.G. The passenger also said that she was married to Jackson and described the circumstances under which she obtained the OFP against him. Furthermore, the state introduced pictures of D.G. and P.G., and Officers Doblar and Sweeney both testified that the woman in the photo of P.G. was not the woman who was in the car with Jackson.

We are required to assume that the jury accepted the state's evidence and rejected Jackson's evidence. *See id.* Based on the state's evidence, the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that the passenger was D.G. and that Jackson had violated the OFP. We therefore do not disturb the jury's verdict.

**Affirmed.**